**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                             Criminal Action No. 5:14-cr-07

BRUCE S. MERRITT,

    Defendant.

## REPORT AND RECOMMENDATION CONCERNING DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on Defendant's Motion to Suppress Evidence filed on March 10, 2014.[1] The United States filed a Response in Opposition[2] on March 20, 2014. The Court held an evidentiary hearing and argument on Defendant's Motion to Suppress on March 21, 2014. Defendant appeared in person and by his counsel Brendan S. Leary. The United States of America (hereinafter "the Government") appeared by Stephen L. Vogrin, in person. The Government presented the testimony of Special Agent Heather Kozik, Special Agent Gregory Perry, and Special Agent Dewayne Haddix. Defendant presented the testimony of his wife, Terrilynn Merritt. At the hearing, the Court admitted as Government's Exhibit one a consent to search form signed by Defendant. The Court also admitted the following exhibits submitted by Defendant: (1) a report of the initial interview of Defendant admitted as Defendant's Exhibit one; (2) a report of an interview of Terrilynn Merritt admitted as Defendant's Exhibit two; and (3) a report of a second interview of

---

[1] Dkt. No. 11.

[2] Dkt. No. 12.

Defendant admitted as Defendant's Exhibit three. No other testimony was taken nor was any other evidence adduced.

## I. INTRODUCTION

### A. Background

On February 4, 2014, Defendant was named in a two count indictment charging him with stealing ten firearms and forty other items from Cabela's Distribution Center. Defendant now moves this Court to suppress evidence seized from his residence.

### B. The Motions

1. Plaintiff's Motion to Suppress Evidence

### C. Recommendation

I recommend that Defendant's Motion to Suppress Evidence be **DENIED** because Defendant gave voluntary consent for the agents to enter his residence without a warrant.

## II. FACTS

In 2013, Defendant, a truck driver, was transporting firearms and other merchandise from Cabela's Distribution Center in Triadelphia, WV to a Cabela's retail store in Dundee, MI. In the late summer of 2013, Alcohol, Tobacco, and Firearm ("ATF") agents began investigating the theft of firearms from shipments traveling from West Virginia to Michigan. A total of ten firearms were missing from these interstate shipments, and Defendant became a suspect in this investigation. ATF agents set up surviellance in an attempt to catch Defendant stealing items from the trucks, but were unable to catch him in the act. On September 21, 2013, Cabela's asset protection team placed a hidden trail camera in the trailer Defendant would be transporting to Michigan that day. When the trailer was dropped off in Dundee, MI, on September 22, 2013, the trail camera was gone, which led

the asset protection team to believe that Defendant was aware that he was under surveillance. As a result, a member of the asset protection team contacted ATF Special Agent Kozik to inform her of the same. Consequently, ATF Agents Kozik, Haddix, and Perry traveled to Defendant's house late in the evening of September 22, 2013, in an attempt to interview him.

At approximately 9:00 p.m., the agents arrived at Defendant's residence. Kozik and Perry walked onto the front porch, while Haddix remained in the driveway. The front storm door was open, but the screen door was shut. Kozik knocked on the screen door, and Defendant came to the door and stepped out onto the porch. Defendant's wife was also in the house, as were her two small children, who were asleep in a bedroom. The agents entered Defendant's residence and sat down in the living room. Defendant confessed to stealing the firearms, as well as numerous other items. He also described in detail how he gained entry into the trailers without breaking their seals. Defendant offered to take the agents into a back bedroom to retrieve two of the stolen firearms. As Defendant walked the agents to the bedroom, he pointed out other stolen items. The agents collected the stolen items in the living room in order to inventory them.

Agents Perry and Kozik asked Defendant if they could search the cab of his truck, which was located outside, and Defendant signed a consent to search form. Agent Perry and Defendant went outside while Kozik and Haddix remained inside and interviewed Defendant's wife. More stolen items were seized from the cab of Defendant's truck. While outside, Perry shined his flashlight in Defendant's parked jeep and saw items that appeared to be Cabela's merchandise. Perry asked Defendant if the items were also stolen and Defendant said that they were stolen. Defendant entered the jeep and gave the items to Perry. Defendant also advised that there may be stolen items in a shed behind his house. Defendant entered the shed and retrieved more stolen items. Defendant informed

the agents that he sold some of the stolen firearms to his nephew. He agreed to escort the agents to his nephew's house to retrieve the firearms. The agents drove Defendant to his nephew's house, but they were unable to recover the firearms. The agents drove Defendant back home and gathered up the stolen merchandise. Before leaving, the agents asked Defendant to try and locate the remaining firearms. On October 2, 2013, Kozik and Haddix returned to Defendant's residence to follow-up on the status of the remaining missing firearms. When the agents arrived, Defendant and his wife were unloading groceries. Kozik and Haddix helped them carry the groceries into the house. Thereafter, the agents interviewed Defendant outside in the driveway. Halfway through the interview, Defendant requested that they go inside because of "nosey neighbors." Once inside, Defendant retrieved another stolen firearm and gave it to Kozik. Defendant also told the agents that he was still attempting to recover the remaining firearms.

### III. MOTION TO SUPPRESS EVIDENCE

*A. Contentions of the Parties*

Defendant contends that the agents' warantless entry into his house was unlawful because the agents did not have a search warrant, nor did Defendant give them consent to enter. Defendant seeks to have the items seized that night, as well as any incriminating statements made by Defendant, suppressed as fruits of the unlawful entry. The United States argues that Defendant voluntarily consented to the agents' entry into his residence, as well as the subsequent seizure of firearms and other items.

*B. Discussion*

It is well settled that warrantless searches and seizure inside a home "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and

4

well-delineated exceptions." *United States v. Bush*, 404 F.3d 263, 275 (4th Cir.2005) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). "Valid consent is a well-recognized exception to the Fourth Amendment prohibition against warrantless searches."*United States v. Neely*, 564 F.3d 346, 349–50 (4th Cir.2009) (per curiam) (internal quotation marks omitted). "In responding to a defendant's motion to suppress, the Government bears the burden of establishing, by a preponderance of the evidence, that it obtained valid consent to search." *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir.2007). In order for consent to be valid, it must be freely and voluntarily given, rather than merely a "begrudging submission to a command." *United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013). "The existence of consent and the voluntariness of consent are related, but analytically distinct issues. The Court looks first to whether the defendant's words or conduct could reasonably be interpreted as providing consent. Once the government establishes the defendant's consent, the Court must determine whether that consent was voluntary." *United States v. Harvey*, 901 F.Supp.2d 681, 692 (N.D.W.Va. 2012) (internal citations omitted).

*1. Existence of Consent*

Here, Defendant contends that he never gave the agents permission to enter his residence; rather, he claims that the agents pushed their way inside without his consent. Thus, before considering whether Defendant's consent was voluntary, the Court must first determine whether Defendant consented *at all* to the agents' entry into his home.[3] However, the testimony regarding whether Defendant invited the agents into his house or whether the agents barged in without

---

[3] Defendant does not argue, nor is there any evidence to suggest, that he did not consent to the subsequent search and seizure of firearms and other stolen items. In fact, the evidence shows that once the agents were inside Defendant's house, he advised them as to the location of stolen merchandise and retrieved the items for the agents. Moreover, Defendant seeks to suppress the items seized and his statements as fruit of the allegedly unlawful entry. While Defendant did present some evidence that his consent was not voluntary, there is no question, based on the record, as to the *existence* of consent with regard to the events occurring after the agents entered his residence.

5

permission is in direct conflict, and the Court must first make a credibility determination.

Both Kozik and Perry, who were on the porch when Defendant opened the door, testified that after they introduced themselves to Defendant and asked him if they could ask him some questions, he said "Come on in," or "Sure," and walked back into the house with the agents following him into the residence. Later, Kozik testified that she could not recall whether Defendant actually said anything or whether he just walked back into the house in response to her question. However, both Kozik and Perry testified that they followed Defendant into the house. Agent Haddix, who remained in the driveway, testified that he could not actually hear the exchange between the Kozik, Perry, and Defendant, but that it appeared to him that Defendant agreed to talk to the agents and led them into the house. In contrast, Defendant's wife, who testified that she was sitting in the living room when the agents knocked on the door, stated that Agent Kozik, after asking Defendant if he knew who the agents were and why they were there, reached around Defendant, opened the screen door, and walked into the house, with Defendant following Kozik into the residence.

As an initial matter, the evidence tends to show that Defendant's wife did not actually have the front-row seat that she claimed she had when the agents first knocked on the door. All three agents testified without hesitation that Defendant's wife was not present in the living room when they first entered the residence, but that she came into the room only after they all sat down and started talking to Defendant. Additionally, although Defendant's wife stated that she was sitting in a recliner when the agents entered the living room, all three agents testified that upon entry into the living room, Defendant sat down in a recliner, Kozik and Perry sat down on the couch, and Haddix sat down in the other recliner. Defendant's wife also testified that from where she was sitting in the living room, the agents would have been able to see her when they were on the porch. However,

6

none of the agents remembered seeing her there, even though they did immediately see a gun rack holding several firearms before they even knocked on the door. After thoroughly considering the record evidence, including the testimony presented during the evidentiary hearing, the Court finds that the agents' account of the events of that night is more credible. Accordingly, the Court finds that Defendant either expressly invited the agents to enter his residence or he turned around and walked back into the house in response to their request for an interview, and the agents followed him inside.

The next issue is whether Defendant's words and conduct in response to the agents' request for permission to enter "would have caused a reasonable person to believe that he consented" to the agents' entry. *United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir.2008) (citation omitted). Consent may be expressly granted, or it "can be implied from a person's words, gestures, or conduct." *United States v. Moreland*, 437 F.3d 424, 429 (4th Cir.2004). "[M]agic words (such as 'yes') are not necessary to evince consent because the key inquiry focuses on what the typical reasonable person would have understood by the exchange between the officer and the suspect." *United States v. Bynum*, 125 F.Supp.2d 772, 783 (E.D.Va.2000), *rev'd on other grounds*, 293 F.3d 192 (4th Cir.2002) (internal quotations omitted).

Clearly, if Defendant said "Come on in," when the agents asked if they could talk to him, the agents' entry was consensual. Moreover, even if Defendant simply responded "sure" and walked back into the house, it can reasonably be inferred from his words and conduct that he was allowing the agents to enter the residence. *See, e.g. United States v. Price*, 54 F.3d 342, 346 (7th Cir. 1995) (holding that the defendant consented to a search of his car by responding "Sure" to the officer's question "Do you mind if I take a look?"); *United States v. Scott*, 2010 WL 5067906 at *4 (M.D.N.C. Dec. 6, 2010) (collecting cases). Furthermore, even if Defendant merely turned around

7

and walked back inside without speaking a word, this conduct, when viewed with the totality of the circumstances, is sufficient for the agents to have reasonably inferred that they were being invited in to Defendant's house. *See, e.g. United States v. Smith,* 30 F.3d 568, 571 (4th Cir.1994) (finding consent where defendant unlocked his car door in response to request to search his car); *United States v. Wilson*, 895 F.2d 168, 170 (4th Cir. 1990) (finding consent where defendant lifted his arms in response to an agent's request to pat him down).

Additionally, "[i]n cases where a defendant's response to a request for permission to search is ambiguous, courts have generally relied upon the defendant's failure to protest the search in finding consent." *United States v. Barrington*, 210 F.Supp.2d 773, 778 (E.D.Va. 2002) (collecting cases). Thus, even to the extent that Defendant's words and conduct can be deemed an ambiguous response to the agents' request for entry, the evidence unambiguously shows that Defendant never protested the agents' entry into, or their continued presence in, his home. Had Defendant not intended his conduct to be viewed as consent to enter, surely he would have objected when the agents followed him into the house and sat down on his couch. Yet Defendant offered no objection at all; instead he cooperated fully with the agents and even pointed out numerous other stolen items throughout the house. In fact, he subsequently signed a consent to search form for the cab of his truck and traveled with the agents to his nephew's house to attempt to retrieve one of the stolen firearms.[4]

---

[4]To be clear, the Court is not suggesting that consent can be inferred solely from a failure to object. However, failure to object as a nonverbal response to the agents' request for permission to enter can clearly be inferred as consent. *See United States v. Jaras,* 86 F.3d 383, 390 (5th Cir.1996) (consent cannot reasonably be implied from a suspect's silence or failure to object unless the officer expressly or impliedly asked for consent to search); *Guerrero v. Deane*, 750 F.Supp.2d 631, 646–47 ("In examining the totality of the circumstances to determine whether a reasonable officer would interpret a gesture or conduct as consent, it is necessary to consider the question posed by, and the actions of, law enforcement officers to which the defendant's non-verbal conduct was a response.").

After carefully considering all of the evidence, the undersigned finds that Defendant consented to the agents' entry into his residence. Moreover, as noted above, Defendant clearly consented to the subsequent seizure of firearms and other items, as well as the search of his truck.

*2. Voluntariness of the Consent*

Having found that Defendant consented to the agents' entry and to their subsequent search and seizure of stolen merchandise, the next question is whether that consent was given voluntarily.[5] *See Harvey*, 901 F.Supp.2d at 692 ("Once the government establishes the defendant's consent, the Court must determine whether that consent was voluntary."). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Whether the accused knew that he could refuse consent is also a relevant factor in determining voluntariness, however "the absence of that factor alone is not dispositive." *Wilson*, 895 F.2d at 172; *see also Mendenhall*, 446 U.S. at 558 ("[T]he Constitution does not require proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search.") (internal quotations omitted). Another relevant factor is the degree to which the defendant cooperates with the officers. *See, e.g. United States v. Smith*,

---

[5] Defendant does not specifically argue that his consent was not given voluntarily because he rests his argument on the contention that he did not give consent in the first place. However, Defendant's wife testified that the reason she and Defendant did not protest the agents' entry into their home or the subsequent seizure of the stolen items was because they were scared and intimidated by the agents.

9

30 F.3d 568, 571 (4th Cir. 1994); *United States v. Whitehead*, 428 F.Sup.2d 447, 452 (E.D.Va. 2006). The government bears the burden of proving that consent was voluntarily given. *Mendenhall*, 446 U.S. 557 (1980).

The undersigned finds that, when looking at the totality of the circumstances, Defendant's consent was voluntarily and freely given. First, the record shows that Defendant was 37 years old on the night in question, spoke fluent English, and interacted appropriately with the agents. There is no evidence that Defendant suffers from any cognitive impairments, and the agents had no reason to suspect that Defendant was under the influence of drugs or alcohol. Defendant had a prior felony conviction, so this was not his first experience with law enforcement officers. Additionally, Defendant was extremely cooperative with the agents throughout the encounter. In fact, Agent Perry testified that he was "shocked" that Defendant was so forthcoming.

Similarly, the conditions under which the consent was given show voluntariness. Although Defendant's wife testified that the agents were "intimidating," the record shows that they were not in uniform and did not display their weapons. Defendant's wife also testified that they spoke to her and Defendant nicely and treated Defendant well throughout the encounter. *See Lattimore, 87 F.3d at 651* ("[A]t no time did the officer use force or a threat of force to coerce Lattimore's consent. In fact, the two men engaged in friendly conversation."); *United States v. Elie*, 111 F.3d 1135, 1145 ("[N]othing in the record indicates an environment that was coercive or intimidating. In fact, Elie engaged the officers in friendly conversation."). Moreover, the agents repeatedly informed Defendant that he was not under arrest and never handcuffed or restrained him. In fact, other than Defendant's wife's testimony that she was intimidated by the agents' presence in her house, the record is devoid of any evidence that the agents were coercive or threatening in their treatment of

Defendant and his wife. To the contrary, the evidence actually belies Defendant's wife's testimony. For example, the agents avoided entering a back bedroom where two small children were sleeping, and Defendant's wife testified that she thanked the agents later for how they treated her and her family. Additionally, when agents returned to Defendant's house several weeks later, Defendant readily invited them inside to talk.

Finally, while it is true that the agents did not initially tell Defendant that he could refuse consent, as noted above, "the Government need not demonstrate that the defendant knew of his right to refuse consent to prove that the consent was voluntary." *Lattimore*, 87 F.3d at 650. Moreover, prior to the search of Defendant's truck, the agents did present Defendant with a consent to search form, which clearly advised Defendant of his right to refuse consent and of his right to demand a search warrant. Significantly, the form also stated that Defendant could withdraw his consent at any time. The agents testified that they reviewed this form with Defendant, and Defendant signed the form indicating his consent. Thus, Defendant was fully apprised of his right to refuse consent and of his right to withdraw his consent, yet he continued with the interview and even traveled with the agents to his nephew's house.

On these facts, the undersigned finds that the government has met its burden of showing that Defendant freely and voluntarily consented to the agents' entry into his residence and the subsequent search and seizure of firearms and other stolen merchandise.

## IV. RECOMMENDATION

Accordingly, the undersigned recommends that Defendant's Motion to Suppress Evidence be **DENIED** because Defendant voluntarily consented to the agents' entry into his residence.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen

(14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: March 26, 2014

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE